## BOYD EX. VS. WHITFIELD.

The sale of a chattel for a fair price, in the absence of proof of an express warranty of title, creates an implied warranty: and though where a chattel passes through several hands, the vendee, who is dispossessed, must look to his immediate vendor, yet where a second or third vendee, by an arrangement with all the parties, assumes the payment of the purchase money directly to the first vendor, and is subsequently dispossessed by title paramount, he will in equity be put in the place of the first vendee and subrogated to the benefit of the implied warranty of title.

In a proceeding by the vendee against his warrantor of the title to slaves, the record of the recovery against the vendee upon a title paramount to that of the warrantor, will be treated as conclusive against him, where he has notice of the pendency of the suit against his warrantee.

*Appeal from Lafayette Circuit Court.*

Hon. THOMAS HUBBARD, Circuit Judge.

WATKINS, for the appellant.

1. The complainant can only rely upon the doctrine of technical estoppel by matter of record, as a conclusive bar to any averment of *the truth*, contrary to the adjudication, *i. e.* that the title of *Nancy Browder et als.*, was not superior or paramount to that derived by Whitfield, or those under whom he claims, from Easely. Being therefore *against equity*, such estoppels are not favored but only tolerated because of the interest which the public have in the end or cessation of every litigation. The doctrine is strictly confined to those cases, where a re-examination is sought, of the same matter before in issue, and between the same parties, or their privies; *i. e.*, those who succeed to their rights, because of the fundamental rule of law that no man shall be held bound by a proceeding to which he was not a party. *State Bank vs. Robinson*, 13 *Ark.* 216, 220.

The authorities and elementary treaties, as to the liability of the warrantor, upon being notified of an adverse claim, usually, and for the sake of brevity, deal in general expressions. It becomes material to inquire here, what sort of notice will conclude the warrantor, so as to *estop* him. It must be apparent, that he will not be estopped, unless the notice was such, as to have made it obligatory upon him to appear and defend, or assist in defending the suit.

In the case of *Dresser vs. Ainsworth*, 9 *Barb. Sup. Ct. Rep.* 619, the essence and effect of the contract of warranty of title, express or implied in the sale of personal property, is defined to be really a covenant for quiet enjoyment. It means, that the vendor *is the owner of the chattel*, and has good right to sell, at the time of the sale; that it is not encumbered, and that the vendee should acquire by the purchase a title free and clear, and *should enjoy the possession*, without disturbance by means of any thing done or suffered by the vendor. The covenant of warranty in the sale of land, amounts to the same thing. Mr. RAWLE, in his treaties on *Covenants for Title* page 196, says, that in the United States, the covenant of warranty and for quiet enjoyment are treated as synonymous. It amounts to an engagement that it should bar or estop the covenantor and his heirs, from ever claiming the estate and that he and they should undertake *to defend it*, when assailed by paramount title. *Ib.* *p.* 198. For the breach of it, the grantee is entitled to be compensated in damages, equivalent to a return of the purchase money with interest, out of the general estate of the grantor, made subject by law for the payment of his debts. *Higgins vs. Johnson*, 14 *Ark.* 312. The analogies, therefore, are in all respects the same, and so ought to hold good in respect of the means to be resorted to by the covenantee, " *to cast the labor and responsibility of the defence upon his covenantor.*"

In all cases where no mode is provided for bringing the warrantor in as a party to the record, it would seem reasonable that the notice should be in writing, and not left to depend upon the uncertainty of parol proof. See the cases cited in *Rawle*

201; *Gilbert vs. The Turnpike Co.*, 3 *John. Cases* 108; *In Re Cooper*, 15 *John.* 533; *Brown vs. Taylor*, 13 *Verm.* 631; BRONSON J., dissenting in *Minor vs. Clark*, 15 *Wend.* 427. In *Harris vs. Rowland's admr.*, 23 *Ala.* 644, the court said: " As to the question whether or not in such a case a parol notice would be sufficient, we decide nothing in the present case." In that case counsel cited *Hunt vs. Langstroth*, 4 *Hals. R.* 223, as holding that a verbal notice is insufficient.

But notice, whether verbal or written, means something more than mere notice or hearsay; and, if verbal, the proof upon which important rights may depend, ought to be at least as clear and distinct, in all material particulars, as the evidence usually required to establish the contents or purport of a lost instrument. It was held in *Paul vs. Whiteman*, 3 *Watts & Serg.* 410, (cited with approbation by Mr. RAWLE, and by the American Editors of *Smith's Lead. Cases, vol.* 2, top *p.* 578,) that to make the notice effectual to bar the warrantor, it must be clear and explicit, and convey precise information, that unless the party to whom it is addressed, take the necessary steps to prove the validity of the title, he will be estopped from doing so, in a subsequent suit on the covenant. So, the notice must have been given within a reasonable time, to enable the warrantor to come in and defend his title by plea as well as by proof, for the *allegata* and *probata* must correspond. *Davis vs. Wilbourne*, 1 *Hill S. C.* 28. In a suit on the warranty, the burden of proof, to show such reasonable and timely notice, devolves on the warrantee. It is not pretended here that Whitfield ever consulted Easely or Boyd, about *his answer*, or at any time called upon them, even for information about the title of Easley. See also, as to the character of the notice, *Collingwood vs. Irvin*, 3 *Watts* 310. Also, *Middleton vs. Thompson*, 1 *Spears* 73, where WARDLAW, J., says, that the modern practice of giving notice, in imitation of the voucher under the ancient warranty, "has been gradually extended to all cases of covenants to warrant either land or personalty." Not only must the recovery have been upon title paramount, but the notice to the warrantor must

29

inform him that the claim asserted, is adverse and superior. Mr. RAWLE, in summing up the authorities, (p. 210,) says: " The notice must be full, distinct and unequivocal, *and expressly require the party bound by the covenant to appear and defend the adverse suit.*"

*Suppose* there was an express contract, on the part of Easely, to warrant and defend the title to the slaves in controversy against all lawful claims, *to Vautier and his assigns.* We take the ground, that such an express covenant is not available in favor of a remote vendee of the same chattel. The obligation of the contract, and the recourse upon it, is personal, and confined to the parties to it. Clearly it is not a right of action, assignable by virtue of our statute of assignments. At the common law, covenants of warranty do not run with chattels. *Platt on Covenants* 27; 1 *Shep. Touchstone* 184; 1 *Co. Lit.* 101 *b.; Bacon Ab. Tit. Warranty B.; Widdle vs. Manderville,* 5 *Cranch,* 331. Mr. PARSONS, in his work on Contracts, before cited, seems to take it for granted, and well understood, that the liability and recourse upon a chattel warranty, is confined to the vendor and vendee. If this be not the law, it is extraordinary, that while thousands of such sales are made with warranty of title, either expressed or implied, no reported cases are to be found establishing and defining the liability of the remote vendor to the remote vendee.

When applied to realty, the covenant of warranty, or for quiet enjoyment, runs with the land, and may well do so, because the subject of the contract is immovable; the action to try the title, is always local; the warrantor knows that there is but one forum before which he can be vouched to make good his title when assailed; the laws respecting the title and ownership, are those of the State or country in which the land is situate, regardless of changes of domicil of any owner or claimant; the title passes only by deed or writing, attended with prescribed forms and solemnities; the muniments of title are carefully preserved in this country, always by matter of record, under the registry system. *The very opposite of all these charac-*

*teristics* belong to the sale of personal property, with warranty of title.

If the warrantor of personal property can be required to follow it, with every change of domicil of his vendee, *and of the various successive owners*, though it be into distant and foreign States and jurisdictions, and there make good the title, under so many disadvantages, it seems to us no sane man would ever take upon himself, or impose upon his representatives, so grievous and hazardous a liability.

The only cases we have been able to find, bearing upon the questions under consideration, are *Middleton vs. Thompson*, 1 *Speers (Law)* 67, and *Salle vs. Light's Exrs.*, 4 *Ala.* 700.

According to the civil law, it would seem that a vendee, who had been expressly subrogated to his vendor's right of warranty, can resort to it. *Davison vs. Chabre's Heirs*, 3 *Cond. Rep. (La.)* 855. But the seller only cedes any right of action he might have against his immediate vendor. The action of warranty, as the same Court say, in *Vannorght vs. Foreman*, 2 *Cond. Rep. (La.)* 480, ought regularly to be brought against his immediate seller, his heirs or successors. The obligation to warrant the thing sold, is personal to the vendor; and, the right to enforce it, is not *ipso facto* by the sale, transferred to all vendees in succession. *Ib., p.* 481.

We submit:

That there is no proof of an express warranty of any kind from Easely to Vautier:

That, at the most, there was only an implied warranty of title, which is personal to the seller and the buyer, beginning and ending with them:

That an *express* warranty of title to *personal property* has no transmissible and *transportable* quality, so as to pass or enure with the title, in all successive changes of ownership or locality.

CUMMINS & GARLAND, for appellee.

We think the case of *Daniels vs. Street*, 15 *Ark.* 307, in its general principles, clearly governs the present.

It is not the law that *written* notice must be given to warrantor, to render the judgment against the vendee conclusive in a proceeding by the latter against the former. Whatever puts him substantially in possession of the facts, the objects of the suit, and the title asserted, is sufficient. It is then his duty to defend. *Story Bills, secs.* 291, 297, 300; 13 *Verm.* 106; 16 *Verm.* 63; 3 *McLain* 358; 5 *Pick.* 385; 15 *Wend.* 425; *Rawle Cov.* 242.

Upon such notice the record of the former recovery is conclusive against warrantors. 7 *Cranch* 322; 1 *J. R.* 518; 7 *J. R.* 170; 4 *Mass. R.* 352; 8 *J. R.* 158; 5 *Wend.* 539; 13 *J. R.* 226.

The want of notice is only material by way of rendering the record in former suit conclusive. Without it the party is entitled to recover upon making the necessary proof. *Rawle*, 253, 254.

The being in possession of personal property, and a sale for full price, constitute a warranty of title on the part of vendor. *Pars. Com. L.* 58; 4 *Kent* 478.

Upon the facts of this case—the actual acceptance of Whitfield as purchaser and paymaster for the negroes—undoubtedly a court of equity will subrogate Whitfield to all the rights of Vautier, the direct purchaser from Easely. This equitable doctrine differs in nothing but form from the doctrine at law as to covenants running with the land. 8 *Engl. C. L. R.* 175; 2 *East.* 575.

Covenants in respect to title to property cannot be dissevered from the property—they constitute part of its value, and are totally ineffectual and void, unless held in connection with the property, or a fictitious substitute for the property—damages recovered as for its value. The covenants are mere *incidents* to the *property*, and the party who has lost the property in equity, is entitled to all the means held by any other persons, which justly ought to be applied to his indemnity. The absurd rule supposed to prevail at law—that if last vendor is wholly insolvent, and he can pay no damages recovered, therefore the vendee, who has lost the property, can look to no other

person—though ten solvent warrantors may stand behind the last vendor. This rule, if it be an absolute rule of our law, and not one merely affecting *legal remedies*—reaches the very height of absurdity.

The doctrine of subrogation, as applied by courts of equity, cures this very evil, by giving the indemnity directly to the person injured, whoever may hold a shadow of legal right to the indemnity.

This identical doctrine is applied at common law, as to commercial paper,—where every endorser is a guarantor—and to covenants running with the land. In such cases, every one of the guarantors is liable to the party injured, and he is not bound to exhaust the nearest one to him, and if *he* be insolvent, lose his indemnity. 5 *Cow.* 138, 139; 10 *Wend.* 180; 4 *Greenl. Cruise* 372, 373; 1 *Smith Lead. Cas.* 22, *et. seq.*

Equity extends the benefit of covenants, which would run with the land, if there were a *legal* estate—to the holders of mere equitable titles. 8 *Paige* 358; 3 *Ib.* 254; 4 *Paige* 510; 1 *Rawle* 155; 1 *Whart.* 229; 1 *Paige* 455; 17 *Sergt. & R.* 84; 3 *Metc.* 83; 4 *N. Hamp.* 454; 5 *Ib.* 529.

Even where there is no covenant running with the land, equity will give the party evicted relief against original vendor not his own vendor. 1 *Dev.* 30.

The foundation of the doctrine of subrogation is this: That the grant of the principal thing—as property—is, ipso facto, a a grant of all incidents and collaterals—as covenants of title, indemnity, and every possible right which goes to make available, secure and beneficial the thing granted. 4 *Am. L. Mag.* 135, *etc.;* 1 *Dev.* 30; 1 *Comst.* 595; 10 *Penn. St. R.* 519; 8 *Ib.* 347.

Our citizens will not be driven to a foreign State to seek indemnity, when it can be had here. 13 *Pet.* 359, 375.

Williamson or Vautier was no proper party here, as no decree could be made against either. 1 *Gall.* 382, 383; 1 *Sto. R.* 646; 10 *Wheat.* 152.

The actual value of personal property is the measure of damages on eviction. *Sedgw. Dam.* 288, 294.

To entitle vendee to sue, a final decree, which cannot be resisted, is sufficient. 1 *Ark.* 233; 4 *Mass.* 352; 4 *Dana* 204; 254; 1 *Dev.* 413; 5 *Hill* 608.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

On the 10th February, 1851, Francis E. Whitfield filed a bill in the Lafayette Circuit Court, against Richard Boyd, as executor of William B. Easley and Lewis B. Fort, making substantially the following allegations:

About the year, 1836, Easley sent from Virginia, where he resided, into Arkansas, certain slaves, which he possessed and claimed as his absolute property, among which were *Peggy* and her four children, *Royal, Beverly, Henderson* and *Hubbard*.

In the year 1836 or 1837, Easley sold Peggy and her children, with several other slaves, in good faith, and for their full market value, to David Vautier, at Spring Hill, in Hempstead county, Arkansas, but complainant did not know the price that was agreed to be given for each or all of the slaves.

Complainant believed that Easley conveyed the slaves to Vautier by bill of sale, "with covenants of title and warranty," but complainant had not been able to procure the original, or a copy of the instrument, and he expressly avers that Easley represented the slaves to be his own by absolute title, and sold and delivered them as such.

Vautier purchased the slaves upon credit, and Thomas S. Williamson, then residing in Lafayette county, Arkansas, became his surety for the payment of the purchase money. Vautier failing to meet the debt at maturity, payment was demanded of Williamson, and he, finding that Vautier could not pay the debt, and that he would have it to pay, proposed to complainant, Whitfield, to sell to him *Peggy* and her four children, and several other slaves, (part purchased by Vautier of Easley and part his own), and complainant agreed to purchase the same. Whereupon, in order to obtain title thereto,

the slaves were taken to Minden, Louisiana, with the consent of Vautier, and there sold as the property of Vautier, and purchased by Williamson, at and by a sale made by the parish judge of the parish of Claiborne, who was ex-officio a notary public, etc. And, thereupon, on the 9th February, 1841, at the parish aforesaid, Williamson and complainant signed an instrument by which it was agreed that Williamson had, on that day, sold to complainant 24 slaves, and among them Peggy and her four children, with other personal property and real estate, for the sum of $16,200; payable thus: $1,200 in cash, $5,000 to the Branch of the Real Estate Bank at Washington, Arkansas, and the residue in one and two years, with interest at eight per cent. from date, either by complainant's own obligation, or that of Lewis B. Fort. To which agreement was added a memorandum, signed by Williamson, and dated 19th February, 1841, admitting, as was true, the receipt from complainant of his acceptance for $5,438 73, payable at nine months at the New Orleans Canal and Banking Company, in lieu of the $5,000 to be paid in Bank, and also the notes of the complainant and Lewis B. Fort for $10,028, at one and two years.

On the 10th of February, 1841, before the same parish judge, Williamson, by a notarial act, conveyed the slaves, etc., to complainant, for the consideration expressed in the agreement, and delivered them to him, and he had thereafter continued in possession thereof, etc.

On the 19th of February, 1841, Williamson was still indebted to Easley, as surety of Vautier, as aforesaid, in the sum of $10,-128; and Lewis B. Fort was indebted to complainant, for the purchase money of a tract of land, in the sum of $8,553: Whereupon, it was agreed by and between Easley (acting by his agent, Carrington) complainant, Williamson and Fort, that Easley would receive in lieu of Williamson's indebtedness to him, the obligations of Fort and complainant, with Williamson as surety, for said sum of $10,128, five thousand dollars thereof payable in one, and the residue in two years, bearing eight per cent. interest from date: by the execution and delivery of

which obligations Williamson was to be released from his pre-existing liability to Easley, and remain liable only as such surety on said obligations—whereupon three obligations were executed, each joint and several, one for $5,000, one for $3,553, and one for $1,575, all dated 19th February, 1841, the first due at twelve, and the two others at twenty-four months from date, with interest thereon, on each, at eight per cent., etc. On the first two of which, Fort was principal, and complainant and Williamson were sureties; and on the third, complainant was principal, and Fort and Williamson sureties. The obligations were delivered to the agent of Easley; and by the execution of the first two, Fort was released and acquitted from his pre-existing liability to complainant on account of the purchase money of said land, etc. This arrangement was ratified and confirmed, in all its parts, by Easley, and the obligations accepted by him; and to secure the payment thereof, on the 15th August, 1843, ($430 80 having been paid on the first obligation,) Fort and complainant jointly executed to Easley a mortgage upon a large number of slaves, nine of which belonged to complainant, (and among them *Royal,* one of Peggy's children,) and the others belonged to Fort. Which mortgage was conditioned for the payment of the balance due on the obligations, on or before the 1st of March, 1844, with a proviso, that if they paid by that day, $2,500, they should have five years from the date of the mortgage to pay the residue, on condition of paying annually, on the 1st of March, one-fifth of the principal, and all interest then due.

Peggy and her children remained in the undisturbed possession of complainant, without his suspecting that there was any adverse title to them, until the year 1847, when, to his astonishment, a bill was filed against him in the Lafayette Circuit Court, in the names of *Nancy Browder and others*, claiming title to the slaves, adverse and paramount to that of Easley and complainant, as devisees under the will of John Stovall, once the owner of Peggy, made in North Carolina, in the year 1819, and also claiming hire for the slaves from March, 1847,

when their alleged estate vested in possession, etc. On service of process, complainant employed competent counsel, answered the bill, made all the defence to the suit in his power, in due time employed other counsel in Virginia to look up and take testimony in defence, and obtained all the testimony in his power. Was compelled to trial at October, 1850, and upon the hearing, the Court decreed the slaves to be the property of the complainants in that suit, with $1,650 hire, and that they be delivered up to them, etc.

That the will of John Stovall devised Peggy to his daughter, Fanny Liggin, for life, and at her death, to her children, who, or whose representatives, were the complainants in said suit. That said Fanny married one Obediah Liggin about the year 1803, and they thenceforward resided in Mecklenburg county, Virginia, adjoining Halifax county, North Carolina, where John Stovall lived. That Stovall had loaned his daughter Fanny the slave Peggy, many years before his death, and for many (more than five) years Obediah Liggin had been in possession of Peggy, she occasionally going to Stovall's at Christmas: on which facts complainant relied in his answer and defence to the suit of *Nancy Browder and others*, as giving good title to the creditors of, or purchasers from Obediah Liggin, under the laws of Virginia: That Obediah Liggin died about the year 1821, and Peggy was sold by some judicial sale, as his property, to pay his debts, soon after his death, and bought by one Shelton, who shortly afterwards sold her to Easley, in Virginia, but whether he knew of said will, or of any such claim as was afterwards set up under it, complainant was not informed.

That said decree determined that the title of Easley was not valid as against the devisees under the will, and that Peggy was not subject by the law of Virginia to the debts of Obediah Liggin, complainant having procured all the testimony in his power, including the law of Virginia bearing on the case. That complainant appealed from the decree to this Court, but did not enter into recognizance, and steps were being taken to

execute the decree, etc.  The proceedings and decree in that suit were exhibited.

Peggy and her children were worth $3,850, and besides losing them, and having to pay the hire and costs decreed against him, complainant had contracted to pay, and partly paid, $750 fees of counsel for defending said suit, and obtaining testimony.

That Fort was still indebted to Easley's estate upon the two obligations in which he was principal, secured by the mortgage, in a sum more than sufficient to cover the value of the slaves, hire and costs decreed against complainant, and counsel fees paid by him, after deducting therefrom about $1,500, still due to Easley's estate upon the obligation, in which complainant was principal, and also secured by the mortgage.  That Fort would pay, in a short time, the larger part of the amount due from him unless restrained, etc.

Vautier died in Texas several years ago, utterly insolvent, and without administration, etc.  Williamson was insolvent and resided in Louisiana.  Easley had died in Virginia, and the defendant Boyd was his executor there, and there was no administrator in Arkansas.

Complainant insists that he had the right to recover of Easley's estate, upon his express or implied warranty of peaceable possession of the slaves, Peggy and her children, etc., and in consequence of said eviction, for value of the slaves, hire, costs and counsel fees, at least $6,300.  That after the remaining indebtedness of complainant and Fort, under the mortgage, over and above that sum, should be paid, all that might be paid by Fort would in fact be paid by complainant, Fort paying solely in discharge of what he before owed complainant; and if complainant was directly or indirectly compelled to pay that sum, he would be without remedy except by an action in Virginia to recover back the money so paid by him from Easley's estate.

Royston was the solicitor of Easley's executor in Arkansas, to collect the money due upon the mortgage, and unless prevented by injunction would do so, etc.

Prayer for decree, that complainant be allowed to retain in his own hands, and be released from payment to Easley's executor, etc., the amount due from 'him upon the mortgage, etc., and that Fort pay to complainant, instead of the executor, so much of the amount due by him upon the mortgage, as would, with the amount retained by complainant, be equal to the value of the slaves, the hire and costs decreed against him in the eviction suit, counsel's fees, etc., etc., or so much thereof as complainant might be entitled to recover against Easley's estate; for injunction to restrain the collection of the money of Fort, by Easley's executor, solicitor, etc., etc., and for general relief.

On the filing of the bill, a temporary injunction was granted, as prayed.

Boyd, the executor of Easley, answered the bill. He does not controvert the sale of Peggy and her children, with other slaves, by Easley to Vautier, upon credit, with Williamson as surety: the failure of Vautier to pay a large portion of the purchase money, the transfer of the slaves from Vautier to Williamson, and from him to complainant, Whitfield, and the assumption by him and Fort of the balance of purchase money due to Easley, secured by mortgage. But Boyd denies that Easley's estate is liable to Whitfield for the value of the slaves, their hire, etc., on account of the alleged warranty of title by Easley to Vautier, and the eviction of Whitfield, etc. He states that he had no knowledge of the suit of *Browder and others* against Whitfield for the recovery of the slaves except from rumor, but denies that the recovery was upon title paramount to that of Easley. On the contrary, he avers that Obediah Liggin acquired an absolute title to Peggy, under the laws of Virginia, by length of possession, before Stovall devised her to Mrs. Liggin and her children, and that Easley derived title to her through Obediah Liggin, etc.

*Fort* answered the bill, admitting its allegations to be true, so far as they related to him, and professing a willingness to pay the amount due from him upon the mortgage debts to Easley's executor, or to Whitfield, as the Court might decree.

After Boyd had answered the original bill, Whitfield filed an amendment and supplement thereto.

In the supplement he states the affirmance by this Court, of the decree in the case of *Browder and others* against him, on his appeal, etc.   See *Whitfield vs. Browder et al.*, 13 *Ark.* 143.

In the amendment, he avers notice to Boyd, as executor of Easley, of the institution and pendency of that suit.   The substance of this amendment, and the answer of Boyd thereto, will be stated below.

Upon the pleadings and evidence on the final hearing, the Court decreed in favor of complainant, as prayed by the bill, to the extent of the value of the slaves, ($3,275,) and the amount of hire decreed against Whitfield, ($1,650,) in favor of *Browder and others*, in the eviction suit, with interest, etc.   Boyd appealed to this Court.

1. There is no evidence in the record before us that Easley transferred the slaves, Peggy and her children, to Vautier, by bill of sale, with express warranty of title.   But it is shown, by the pleadings and evidence, with sufficient certainty, that Easley was in possession of the slaves, claimed them as his own absolute property, and sold them to Vautier, as such, for a fair price.

Upon the sale of a chattel for a fair price, by one in possession, the law implies a warranty of title, and the seller is answerable to the purchaser, if it be taken from him by one who has a better title than the seller, whether the seller knew the defect of his title or not.   1 *Parsons on Contracts* 457; 2 *Kent's Com.* 478; *Story on Sales, sec.* 367, *etc.*

The warranty thus implied, is, doubtless, a contract personal to the vendor and the purchaser, and does not pass, by a mere transfer of the property, to any subsequent purchaser, so as to give him the right of action against the first vendor for breach of the warranty.   The purchaser who loses the chattel by the interposition of one who has a paramount title, must look for redress to his immediate vendor.   There are covenants of warranty which pass from one to another by the mere sale and

transfer of land, but this rule has no application to the sale of slaves or other chattels. *Riddle vs. Mandeville*, 5 *Cranch* 351; *Offutt vs. Twyman*, 9 *Dana* 43; *Salle vs. Light's Exrs.*, 4 *Ala.* 700. Whether a bill of sale warranting title to a slave, is assignable, under our statute, is another question.

If the case before us, therefore, were, simply, that Easley sold the slaves to Vautier, he to Williamson, and he to Whitfield, each vendor expressly or impliedly warranting title to his vendee, and Whitfield was evicted by paramount title, his remedy would be upon the warranty of his immediate vendor, and he would have no right of action against Easley. But such is not the case before us.

Easley sold the slaves to Vautier upon credit, with Williamson as surety. Vautier failing to pay the purchase money when due, caused the slaves to be transferred, by a notarial sale to the surety. If there had been no further sale of the slaves—if Williamson had kept them, and they had been recovered from him by a title paramount to that of Easley—could Easley afterwards have compelled him to pay the purchase money as surety for Vautier? Would not the surety have been subrogated to the rights of the principal? (See *Newton Exr. vs. Field*, 16 *Ark.* 216.)

But Williamson did not keep the slaves. He sold them to Whitfield, and by an arrangement between all the parties, Whitfield assumed the payment of the purchase money directly to Easely, and secured it by mortgage. Fort joined in the obligations and mortgage, because he was indebted to Whitfield. The purchase money has not yet been paid to Easley. If paid, it must be paid with the money of Whitfield. But Whitfield has lost the slaves: the consideration for which he contracted the debt, has failed. Under these circumstances, has he less claim to protection and relief in equity than Williamson would have had in the case above put? Would it be in accordance with principles of equity and good conscience to permit Easley's executor to collect of Whitfield the purchase money of the slaves thus assumed by him for Williamson and Vautier, by

agreement with Easley, after Whitfield has been deprived of the slaves by title paramount? We think not. Yet such would be the result, if the decree in this case were reversed, the injunction dissolved, and Easley's executor permitted to enforce satisfaction of the mortgage, etc.

We think the effect of the arrangement between the parties, by which Whitfield took the slaves, and assumed the payment of the purchase money due from Vautier to Easley, was that Whitfield was put in the place of Vautier, and, in equity, subrogated to the benefit of the implied warranty of title, etc.

2. but it is insisted, that Whitfield was not deprived of the slaves etc., by a title paramount to that which he derived from Easley.

Whitfield relies upon the record of the proceedings and decree in the case of *Browder and others* against him, as conclusive upon this point: and Boyd controverts its conclusiveness, for want of notice.

The pleadings and evidence in relation to notice, are substantially as follows:

In the amendment to the bill, Whitfield states that Royston, a solicitor, practicing in the Lafayette Circuit Court, and residing in Hempstead county, was the agent, and only agent in south Arkansas, of Easley, during his lifetime, and of his executor Boyd, after his death; and, as such, had in his hands for collection, the obligations and mortgage executed to Easley by Whitfield, Fort, etc., for the purchase money of the slaves, under the arrangement above stated.

That after the institution of the suit by *Browder and others* against Whitfield, in the Lafayette Circuit Court, for the recovery of the slaves, and before the cause was at issue, or any of the testimony was taken therein, he went to Washington, Ark., and informed Royston, as such agent and attorney, of the institution and nature of the suit, and told him that his client was as much interested in the defence of the suit as he, Whitfield, was, and requested him to attend to it, and help to defend it. That Royston being unwell, and unable to attend the Court, said he

would speak to his partner, John W. Cocke, to attend to it. That Cocke did attend to the suit at the next term thereafter, making no charge therefor against Whitfield, etc. That Boyd, as the executor of Easley, was thus, through his agent, notified of the institution, and object of the suit, etc.

That Boyd resided in Mecklinburg county, Virginia, where Easley died; and Whitfield employed counsel at Oakville in that county, to procure testimony to defeat the suit. That his counsel, and the adverse parties, took several depositions in Mecklinburg, and in the adjoining county of Granville, North Carolina, and Boyd must have been advised thereof, and informed of the pendency and nature of the suit, etc.

*Boyd*, in his answer to the amendment to the bill, denies that he had any notice of the suit against Whitfield for the slaves, until after it was decided. He states that he was not informed of its existence even by rumor until it was too late for him to render any assistance to the defence. He denies that he was notified of its pendency by Whitfield, or by Royston: and, upon information, denies that Royston was notified as alleged, and if he was, avers that he was merely an attorney for the collection of the obligations upon Whitfield and Fort, and not a general agent, and therefore submits that notice to him would be of no avail, etc. Denies that Cocke appeared in the defence of the cause as his attorney; and states that he nor Royston rendered any charge against the estate of Easley therefor, etc.

States that a letter was received by him, which he did not preserve, the date of which he did not recollect, addressed to him by a gentleman whose name he had forgotten, stating that there was a suit for several slaves, naming them, and enquiring of him whether he knew the slaves, and from whom his testator purchased them. He did not then know that his testator had ever owned such slaves; but on enquiring, ascertained that he had, and that he had purchased them of David Shelton. Supposing the object of his correspondent was to identify the slaves, he concluded to enquire into the matter, that he might be enabled to give the desired information. On mentioning

the subject to Shelton, he was refered to Mr. Wood and Mr. Tazewell, and told that they were the counsel of the parties. Afterwards, meeting with Mr. Tazewell, he mentioned to him the fact that he had received such a letter, and was informed by him that there was a suit, and that he, as the counsel of Whitfield, had attended to the taking of a number of depositions in the case. That the case was a plain one, and no doubt would be decided in favor of Whitfield, and that such was the opinion of Mr. Pike, who was the counsel for Whitfield in Arkansas. This conversation occurred some considerable time after the taking of the depositions referred to; for in the conversation Mr. Tazewell spoke of a record of the case, which had been sent to him from Arkansas, and which he then, or in a few days thereafter, lent to him (Boyd) and which contained the depositions of John Butler, and Mathew Chandler. In the conversation, there was no intimation by Tazewell that Whitfield required or wished him (Boyd) to give any assistance in the suit, or that the rights or interests of the estate of Easley, were to be litigated therein. On the contrary, it appeared from the statement of Tazewell, that abundant testimony had been taken, and that nothing more was to be done to prepare the suit for trial, if indeed it had not been decided. He avers that this was all the notice, or information, which he had of the existence of the suit, which he submits was no notice at all, etc. He attributes the result of the suit to negligence on the part of Whitfield, etc.

The depositions in relation to this branch of the case, are, in substance, as follows:

*E. A. Warren*, deposes that at the first term (July, 1847,) after the institution of the suit of *Browder et al.* against Whitfield, John W. Cocke (since deceased) then the partner of Mr. Royston in the practice of the law, attended the Lafayette Circuit Court, and interposed and argued a demurrer to the bill.

[It appears from the record that there was a demurrer filed, argued and submitted at that term, taken under advisement by the Court, and sustained at January term, 1848, with leave to

file an amended bill. The clerk states that the demurrer is lost.]

*G. D. Royston*, deposes that he was the attorney of Easley in his life time, and of his executor, Boyd, after his death, and, as such, had in his hands for collection, the obligations of Whitfield, Fort, etc., secured by mortgage, above referred to. He had no general agency, but was acting merely as an attorney in the collection of the debt, etc. He did not know, except from hearsay, what the consideration of the obligations, etc., was. He had no recollection of ever having been notified by Whitfield of the institution of the suit of *Browder and others* for the slaves, or of being requested to attend to it, as the attorney of Boyd, or otherwise. Nor did he remember to have requested his partner Mr. Cocke, to attend to any such suit. Deponent had rendered no account against Easley's estate for such services, and Mr. Cocke had made no charge upon the books therefor. Thinks that if he had received notice to attend to the suit, he would have done so, or would have made provision for its defence.

*Littleton Tazewell*, states that during the pendency of the suit of *Browder et al.* against Whitfield, in the Lafayette Circuit Court, for the recovery of Peggy and her children, Mr. Pike, the attorney of Whitfield, sent to him a transcript of the record thereof, and requested him to procure any evidence that could be obtained for the defence in his section of country (Mecklinburg Co., Va.). Afterwards, Mr. Pike wrote to him that *Browder et al.* had given notice that they intended to take the depositions of Mathew Chandler and John Butler, in Granville Co., North Carolina, and requested him to attend and cross-examine for the defence, which he did. Some months after he received the transcript of the record referred to, Boyd, the executor of Easley, enquired of him as to the nature of the suit, saying that he had made similar enquiries of Mr. Wood, the counsel for *Browder and others*, and of David Shelton, from whom Easley purchased Peggy, etc., and had been informed that deponent could give him the best information in regard to it. Deponent

30

stated to Boyd the chief points in the case, having a distinct recollection of them, and told him he would hand him the transcript of the record before mentioned. The transcript did not contain the depositions of *Mathew Chandler* and *John Butler*, for after the suit had been decided, it became necessary for Mr. Pike to send him a copy of those depositions in order that he might retake them [to be used in this suit.] In a few days after the conversation above mentioned, Boyd applied to deponent, at his office, and he gave him the transcript of the record, read to him all the letters he had then received from Mr. Pike, as counsel for Whitfield, concerning the *Browder* suit, and gave him all the light deponent had on the subject. In one of the conversations above referred to, Boyd asked him if Easley's estate would be responsible, or lose, if Whitfield was cast in the suit. He replied, in substance, that Whitfield could only be cast on the issues made in the record, on the grounds of title in *Browder et al.*, and want of title in Easley, and if so, his estate would clearly lose. Boyd then enquired if David Shelton would not, in that event, be responsible to Easley's estate: and deponent replied that he certainly would be, as the vendor of Easley, provided an action was brought against him within the period of limitation. Boyd afterwards returned to deponent the transcript which he had loaned him, and said he had read it, and on deponent telling him that he could keep it longer if he chose, he said he had no further use for it. These transactions and these conversations with Boyd, occurred during the pendency of the suit of *Browder et al.* against Whitfield, in the Lafayette Circuit Court, and long before it was decided. Afterwards, and after Whitfield had commenced this suit against Boyd, deponent loaned him the second transcript sent him by Mr. Pike, containing the depositions of Chandler and Butler. Deponent was never directed by Whitfield, or his counsel, to give any sort of notice to Boyd.

*Tarwater*, states that Boyd applied to him for information about the suit of *Browder et al.* against Whitfield, some time between September, 1849, and March, 1850, and he referred him

to Mr. Tazewell and others, but particularly to the former as the counsel for Whitfield. Boyd appeared to know something about the suit, when he applied to deponent, but came to him for further information   Did not remember what particular information he desired, and did not know whether he had previously conversed with Tazewell on the subject or not. The depositions of *Mathew Chandler* and *John Butler* were taken before Boyd applied to deponent for information. Boyd took a memorandum of the information furnished by deponent, but he did not remember what it contained. Deponent lived at Clarksville, Mecklinburg county, Virginia, and employed counsel to take depositions for *Browder and others, etc*.

*Henry Wood*, deposes that he met Boyd on the street, after taking depositions in the case of *Browder and others*, against Whitfield, and Boyd submitted to him several questions, in which his object seemed to be to elicit the opinion of defendant in regard to the force of the testimony which had been taken. This was some time in the spring of 1850, after the middle of March, etc. He had no previous conversation with Boyd on the subject. He attended to taking the depositions as an attorney for *Browder et al*.

In *Davis vs. Wilbourne*, 2 *Hill South Car. Rep.* 27, the Court said the doctrine of voucher was strictly and technically applicable to real actions. But the principle, as far as it is applicable, has been long applied in cases involving the rights of personal property. If one is sued for a personal chattel, the first advice he obtains from his counsel is, to give notice to his warrantor, if the title to him be warranted, to come in and defend it. It is a part of the contract of warranty, that the warrantor shall defend the title: and by this mode of proceeding two objects are obtained: 1st. It gives the defendant the advantage of the better information, which the warrantor is supposed to possess in relation to the title; and, 2d. Saves the necessity of trying the same title again in an action against the warrantor. The notice to the warrantor makes him a privy to the record, and he is bound by it to the extent to which his

rights have been tried and adjudged; and in an action against him, at the suit of the warrantor, in addition to the record, all that is necessary to be shown is, that his title was in issue, and judgment given upon it. I believe (says the judge) no rule has heretofore been established, in such cases, as to the time when notice should be given to the warrantor. In cases within the summary jurisdiction, it ought, if practicable, to be given at or before the return of the process. In cases within the general jurisdiction, notice at any time before the expiration of the rule to plead, would seem to be in time. The object is, to enable the warrantor to come in, and defend his title. He ought, therefore, to have a reasonable time to prepare for it, and the time which the law allows to a defendant, furnishes, perhaps, the safest rule. In the first class of cases, however, the process might be served on the last hour of the last day before the return, so as to render the service of the notice impracticable before the return. In those cases, notice within a reasonable time would be all that could be expected. So, *where the warrantee had entered an appearance, and put in his plea to the merits, I should think notice, even after the continuance, if the warrantor had sufficient time to prepare evidence for the trial, would be sufficient.*

*Pickett's Exr. vs. Ford,* 4 *How. Miss.* 250, was an action by the warrantee against the warrantor, upon the warranty of title to slaves. The plaintiff relied upon the record of the judgment by which the slaves had been recovered from him, by title paramount. There was no proof that he had notified the warrantor of the pendency of the suit, but it was proven that the warrantor was present at the trial. The Court said: "The object of notice is to give the warrantor an opportunity to protect his own interest by aiding the defence. He may then prepare himself, and come in with his information and evidence, and show, if he can, that he had the right to make the warranty, and that it is a good one. But if these purposes can be answered by the voluntary appearance of the party, where is the necessity of notice? Or if he appears at the time of

trial, is it not sufficient to justify a belief that he has done so in obedience to notice? His presence at the trial gives him all the advantages that the law presumes to be necessary, and the sole object of notice is accomplished. It was proven by a witness that the warrantor was in Court at the time of the trial, which, I think, was sufficient to justify the introduction of the judgment as evidence," etc.

*Barney vs. Dewey*, 13 *John. R.* 225, was an action for breach of warranty in the sale of a horse, and the Court said: "There is no allegation of notice to the defendant of the pendency of the suit brought against the plaintiff for the horse, but there is an averment of a fact tantamount. It is alleged that the defendant was a witness on that trial, and proved, himself, that he did not own the horse when he sold him to the plaintiff." See, also, *Blasdale vs. Babcock*, 1 *John. R.* 517; *Brewster vs. Countryman*, 12 *Wend.* 450.

In *Minor vs. Clark*, 15 *Wend.* 427, the Court said: " The object of notice is to inform the grantor that a suit has been brought against his grantee: the grantor is supposed to be better able to defend such a suit, and by his covenant he has undertaken to warrant and defend the grantee against the claims of all persons. A parol notice gives the information to the grantor quite as well as a written one; and as there is no technical rule requiring such notice to be in writing, no writing is necessary."

In *Middleton vs. Thompson*, 1 *Spear's Rep.* (*S. C.*) 69, the warrantee entered an appearance to the eviction suit, and pleaded to the merits, and gave notice to the warrantor of the pendency of the suit two months before the trial. The Court, approving the rule laid down in *Davis vs. Wilbourne*, 1 *Hill* 27, *supra*, held the notice to be sufficient—that it afforded the warrantor reasonable time to prepare evidence for the trial. See, also, *Train vs. Gold*, 5 *Pick.* 379.

In *Ives vs. Niles*, 5 *Watts* 325, the Court said: " No rule is better settled than that the warrantor of the title, as between him and his warrantee, or those claiming under the latter, shall

not be permitted to gainsay the propriety and justice of the recovery of the land from the warrantee, under an adverse title alleged to be paramount to that of the warrantee where the warrantor has been a party himself to the ejectment in which the recovery is had, *or has had notice of the action being brought, from the warrantee, in time to enable him to defend if he pleases*. See, also, *Collingwood vs. Irwin*, 3 *Watts* 306.

*Mr. Rawle*, in his work on Covenants for title to real estate, page 256, says, the notice must expressly require the covenantor to appear and defend the adverse suit.

So in *Collingwood vs. Irwin*, 3 *Watts* 310, the Court intimate that a notice, to be regular, must request the covenantor to appear and defend against the adverse suit.

In *Eldridge vs. Wadleigh*, 12 *Maine* 372, the Court said: " The warrantor, in the conveyance of real estate, is bound to indemnify the grantee, if the title fail, against the costs incurred in attempting to defend it, if he has notice of the suit, and is called upon to take upon himself the defence. Every reason, upon which this rule of notice is founded, applies with equal force to the warranty implied upon a sale of personal chattels. Without determining that the vendor of such property would be liable for costs, upon such notice, we are 'very clear that he would not be, without it, and none appears to have been given in this case."

In the case before us, there is no proof that Boyd was requested to assist in the defence of the adverse suit, and perhaps, it was on that account that the Court below did not allow Whitfield the cost and counsel's fees expended by him in defending the suit.

In an action of ejectment, the person from or through whom the defendant claims title to the premises, may, on his motion, be made co-defendant. *Dig.*, *ch*. 60, *sec*. 5.

The covenantor, of course, could not be made a party to the suit without notice to come in and defend. If, upon receiving such notice, he neglects to do so, there is good reason not only for treating the judgment as conclusive upon the validity of

his title, so far as it was involved, but for holding him responsible for costs expended by his covenantee in defending the suit.

In a suit against the purchaser of personal property, by one claiming adverse title, there is no provision in our law for making the warrantor a party, but, on receiving proper notice, he can furnish evidence of his title, and assist in the defence. On receiving notice, in a reasonable time, of the institution, or pendency of the suit, he is afforded an opportunity of defending the title which he has warranted, and, if he fails to do so, there is no good reason why the judgment upon the validity of that title should not be conclusive against him in an action upon the warranty. See *Daniel vs. Street*, 15 *Ark*. 307.

If the purchaser would make him liable for the expenses of the adverse suit, it would seem that he must give him notice to come in and defend. *Eldridge vs. Wadleigh, ubi. sup.*

In this case, it is unnecessary to enquire whether notice to Mr. Royston, as the attorney of Easley's executor, would have been sufficient or not, because the proof fails to establish such notice. It appears that Mr. Cocke, the partner of Mr. Royston, interposed a demurrer to the bill, but at whose instance is not shown.

The original bill of *Browder and others* against Whitfield, was filed 13th May, 1847. At the following July term, the demurrer was interposed, and by the Court taken under advisement until January term, 1848, when it was sustained, and leave given to file an amended bill, which was filed 10th of February, 1848, in vacation. At the July term, 1848, the complainants asked and obtained leave to file another amended bill, and the defendant was allowed until the next term to plead, answer or demur. The answer of Whitfield was accordingly filed at the next term, 2d May, 1849, and a replication interposed thereto. The cause was finally heard, and decree rendered against Whitfield, on the 1st of November, 1854, the term commencing, it appears, on the 30th October.

Mr. Tazewell states that he placed in the hands of Boyd, the executor of Easley, a transcript of the record, while the suit

was pending, and long before it was decided, and advised him fully of the character of the suit, and that Easley's estate would be liable to Whitfield if he lost the slaves. The transcript, no doubt, contained the bill, in which the title of Browder and others to the slaves, under the will of Stovall, was fully set out, and shown to be adverse to the title derived by Whitfield from Easley. It perhaps contained also the answer of Whitfield, in which he relied upon the title derived by Easley from Obediah Liggin. (See *Whitfield vs. Browder et al.*, 13 *Ark.* 145.) Thus the notice to Boyd was unusually full as to the character of the adverse suit. It is probable, from the other testimony, that he received this notice from Tazewell as early as March, 1850, *more than six months before the hearing*.

It is to be inferred from the testimony of Mr. Wood, that Boyd was present when some of the depositions were taken. Being thus notified of the pendency, and object of the suit, and residing in the section of country where the witnesses lived, he had a reasonable time, and a favorable opportunity of ascertaining if there was any additional testimony to be obtained in support of Easley's title, and of advising Whitfield, or his counsel of it.

It appears that Whitfield made a full and energetic defence to the suit. He not only employed counsel to defend in the Court where it was brought, but he also employed counsel in Virginia to procure all the testimony that could be obtained there. There was, manifestly, no fraud or collusion between him and Browder and others.

Upon all of the facts of the case, therefore, we shall treat the record of the decree in favor of *Browder and others* against Whitfield as conclusive evidence of a recovery upon title paramount.

The consequence is, that the decree of the Court below must be affirmed.