## Marlatt vs. Clary & Latimer.

In a suit for a breach of an implied warranty of title in the sale of personal property, the record of the proceedings and judgment for the value of the property, by a third party, against the vendee, if it appears that the recovery was not upon a title derived from him since the purchase, is conclusive evidence against the vendor that the property was recovered by title paramount, if it be shown that the vendee had given the vendor due and proper notice of the pendency of the suit against him (19 *Ark.* 447): if legal notice be not given to the vendor, the judgment is only *prima facie* evidence, which may be rebutted.

In a suit by a purchaser of personal property against the seller, upon a warranty of title, the value of the property is the measure of damages: and if the property has been recovered of the purchaser by title paramount, and due notice given to the seller of the adverse suit, requiring him to defend, the purchaser is also entitled to recover the costs and expenses necessarily incurred in defending the suit; but if he has not given such notice, he is not entitled to recover his costs and expenses.

Pilots of coal-boats, in the absence of the owners or supercargoes, exercising the powers and duties of captains or commanders—their authority over the boat and cargo is, under ordinary circumstances, limited to the mere duty of transportation and preservation: but under circumstances of great emergency—as in the case of wreck and imminent danger of an entire loss—they have authority to dispose of boat and cargo, from the very nature and necessity of the case.

No special custom, as to the power and authority of pilots of coal-boats, prevailing at the port of shipment, different from the general custom, would be binding on persons residing elsewhere, in the absence of any proof that they had notice of such special custom.

*Appeal from Phillips Circuit Court.*

Hon. GEORGE W. BEAZLEY, Circuit Judge.

FOWLER & STILLWELL, for appellant.

The authority of the pilot to sell is clearly disproved. As the agent of the owners for a special purpose, no such authority can be implied, unless it was necessary to the successful execution of his trust. *Story on Agency, sec.* 61, *p.* 74, (*2d Ed.*), *and authorities cited; Livermore on Agency, vol.* 1, *p.* 102.

Marlatt was entitled to recover upon an implied warranty. *Story on Sales, sec.* 367; 1 *Parsons on Con.* 456; 1 *John. R.* 274; 29 *Ib.* 196, 3 *Cow.* 274; 1 *Metc. R.* 551; 15 *Ark.* 311.

The record of recovery by Owen & Johnson against Marlatt, was competent evidence. *Clark's exrs. vs. Carrington*, 2 *Cond. R.* 511; *Somerville vs. Hamilton*, 4 *Ib.* 438.

The evidence of the custom of the particular trade was improperly excluded. See *Whar. Dig. Penn. R.* 252, 364; 3 *Conn. R.* 346; 8 *Wend.* 266.


CUMMINS & GARLAND, for appellee.

Without notice the judgment in Pennsylvania was not the measure of damages. *Rawle on Cov.* 249, 247, 248. The true measure of damages is the purchase money and interest. 4 *Kent* 529 *to* 539.

No special contracts or customs can govern the rights of persons growing out of the navigation of the high seas or our inland seas. 14 *Ark.* 370.

The commander of a vessel has an absolute right to sell the vessel, in cases of extremity, and the sale is binding on the owner. *Ab. on Ship.* 7 *to* 23, *and notes to pages* 18 *and* 19.


Mr. Chief Justice ENGLISH delivered the opinion of the Court.

*Assumpsit* by James Marlatt against Clary & Latimer, late partners, etc., upon an implied warranty of title in the sale of two flat-boats laden with coal, etc.

The first count in the declaration alleges, in substance, that upon the representations of the defendants, that they had good title thereto, the plaintiff, on the 9th of July, 1850, purchased of them, at $700, two flat-boats loaded with stone-coal, their cables, boards, etc. That the defendants' representations as to their title were false; that they had no title to the boats, etc., but they were the property of Owen & Johnson, who brought suit against the plaintiff for the value of the boats, etc., in the District Court of Alleghany county, Pennsylvania, and recovered judgment for $1706 00, with costs, etc., which he had paid.

The second count alleges no suit against plaintiff for the value of the boats, etc., but avers that they were the property of Owen & Johnson, of Pennsylvania, and that plaintiff was compelled to pay them $1800, and was put to other charges and expenses on account of the boats, etc., amounting to $200, etc.

The cause was submitted to a jury on the general issue, and verdict and judgment for the defendants. The plaintiff excepted to several decisions of the Court, and appealed.

From the bill of exceptions, the following facts appear:

On the trial, the plaintiff read in evidence the following instrument:

"Helena, Ark., July 9th, 1850.

James Marlatt

Bought of Clary & Latimer two flat-boats and loads with stone-coal, lying on the shore just below Clarie's house, with two cables and boards belonging to said boats, for seven hundred dollars.

Received payment,

CLARY & LATIMER."

*Wm. Clow*, whose deposition was read by the plaintiff, deposed that he was by occupation a coal-boat pilot, and piloted coal-boats for Owen & Johnson, in the spring of 1850, from Pittsburg to New Orleans. A pair of coal-boats piloted by him for them were lost, at the foot of Montgomery's bar, opposite the mouth of Yazoo pass, by being snagged, the coal was

sunk in the river, both boats being covered by water—they contained about 16,000 barrels of coal. Witness, as the pilot of Owen & Johnson, sold the boats to Clary & Latimer, and they sold them, as they lay in the water, to Marlatt. The boats were sunk about the 1st of May, 1850. Owen & Johnson sued Marlatt for the boats and coal during the same year, at Pittsburg, and deponent was a witness in the case.

*Wm. R. Graham*—for plaintiff—deposed that he was sent down by Marlatt, in September, 1850, to get the coal out of a pair of boats that had been sunk about eight miles below Helena, Ark. (on the Mississippi river.) They were the same boats bought by Marlatt of Clary & Latimer; were marked on the sides O. & J. Clary was there, lived there, and witness boarded with him while engaged in removing a portion of the coal to another boat. Heard Marlatt's son tell Clary that Marlatt had been sued for the boats and coal.

Plaintiff then read in evidence a transcript of the suit brought against him for the value of the boats and coal, (Trover) by Owen & Johnson, in the District Court of Alleghany county, Pa. The suit was commenced August 27th, 1850, tried on the issues 10th February, 1853, and verdict and judgment against Marlatt for $1706, damages, etc. Alias fi. fa. returned with an acknowledgment of full satisfaction by Owen & Johnson.

*Owen*, of the firm of Owen & Johnson, whose deposition was taken by plaintiff—deposes that in the year 1850, Owen & Johnson shipped a pair of boats, laden with coal, from Pittsburg to New Orleans, consigned to an agent in the latter place, which were commanded and piloted by *Wm. Clow*, and contained about 8,000 barrels of coal each. The boats were snagged in the schute of the St. Francis, on the Mississippi river. It was thought advisable by the pilot to run them on Montgomery's bar, eight miles from Helena. Without giving Owen & Johnson, the owners of the boats, any notice of the disaster, the pilot thought proper, without their knowledge or consent, to sell them to Clary & Latimer. Owen & Johnson ordered their agent, in New Orleans, to go or send some per-

son to the purchasers of the boats and coal, and demand them in their name, and to tender to the purchasers the amount of money paid by them to the pilot, etc. The purchasers refused to give up the boats and coal to the agent of Owen & Johnson.

Subsequent to this demand by their agent, Marlatt, of Alleghany county, Pa., purchased the boats and coal of Clary & Latimer; and, after Owen & Johnson learned that he had bought them, they made a demand upon him for the boats and coal, and he also refused to give them up. They then sued him in Alleghany county, and obtained judgment for $1706 00, with costs of suit. This amount was exclusive of the $600 which was paid to Clow by Clary & Latimer, which being added would have made the whole amount allowed as the value of the boats and coal, at the place where Clary & Latimer bought them, the sum of $2,306.

It was not the custom in shipping of coal to New Orleans from Pittsburg to give any pilot, commanding coal boats, liberty to sell coal under any circumstances. Such has been invariably the orders of Owen & Johnson to all pilots and commanders in their employ. They were in the practice of shipping large quantities of coal from Pittsburg to New Orleans, both before and since the transactions referred to relative to the boats in controversy.

(1). Upon the motion of the defendants, the Court suppressed all of that part of Owen's deposition in which he states a demand on Clary & Latimer for the boats and coal, and their refusal to give them up, on the ground that it was hearsay; (2). also that part in which he states the custom of Pittsburg as to the powers of pilots of coal-boats, on the grounds that that was settled by law, and not by any special custom, etc.

*James Watson, jr.'s* deposition was offered by plaintiff, and excluded by the Court. He states that he resides in Alleghany county, Pa., and is a coal merchant, and has been engaged in the business since the year 1847. Attends to the business of a firm largely engaged in the shipment of coal from Pittsburg to New Orleans. Hires pilots, etc., etc. It is not the custom for

the pilots to exercise any ownership on the boats, or to dispose of either the boats or the coal, unless authority is given to them by the owners in the special case, and in every case, whether it be by loss of boats or otherwise.

(3). The Court excluded this deposition, on the ground that it related to the custom of Pittsburg, etc.

*McGowen*—deposed that he was the clerk of Owen & Johnson, and was present and heard Johnson make a demand upon Marlatt for the boats and coal, etc., as they had come into his possession after they were sunk, etc.

*Loomis*—deposed that he was the attorney of Marlatt, in the suit brought against him by Owen & Johnson, for the value of the boats and coal. That the suit was faithfully defended, and he charged Marlatt a fee of $100, for his services in the defence, which had been paid, etc.

*Robert Watson's* deposition, (taken at New Orleans,) offered by plaintiff.—Had been transporting coal from Pittsburg to New Orleans for 17 or 18 years. It was not customary on the river for pilots to sell coal on the way down, under any circumstances. His house never allowed it, and he never knew of an instance where it was allowed. It was not customary for pilots to sell the boat's load, and they never did it without special agreement. It was not customary to insure coal. His house never insured any.

*Cross-examined*—His house never expected pilots to sell the coal under any circumstances; when the boats were wrecked they expected the pilots to do all in their power to save the coal, but not to sell it. He never allowed his pilots to sell at any price, or under any circumstances. They were not allowed to exercise discretion to sell. He had known plaintiff (Marlatt,) for 20 years, who had been a coal dealer ever since he knew him, and had an excellent opportunity of becoming well acquainted with the customs of the trade and the powers of the pilots. But these things have changed greatly since Marlatt left the trade of running boats regularly, which was about the year 1837. Since he quit the regular trade of running coal boats,

he has been running supply flat-boats down the river for plantation purposes. The pilots, since he quit the regular business, have had enlarged powers, and are in fact the commanders of the boats in all things that pertain to the running of them. They are hired to pilot the boats, and for nothing else. Defendant's testimony relates to the general custom, but there are sometimes special exceptions, where, for instance, a pilot is a part owner, or has an interest, or where there is a special agreement to the contrary, with power to sell.

(4.) The bill of exceptions states that the court excluded all that portion of this deposition which relates to the custom of Pittsburg, and of pilots of coal boats, etc.

*Dr. Hubbard.*—The boats were wrecked near Clary & Latimen's, eight miles below Helena, and purchased by them. Saw the boats the day they were wrecked. They were brought into the shore in the morning. Hearing they were wrecked he rode down to examine them. Found the boats sunk down on the sand at the bank, which was a shelving one, at an angle of 45 degrees. Considered them in a very dangerous and perilous condition. Learned from Latimer that he and Clary had paid $350 for the boats, and witness thought they had made a very bad bargain. Did not think that there was much chance for saving the boats, unless immediate action was taken for that purpose. They were weak boats of light construction. About 18 inches of the boats were out of water, next to the shore. The parts further from the shore were entirely under the water. The boats were about six feet deep. The man who had charge of them, who was represented as the pilot, said that they had struck a snag above Helena, and that they had run down to the place at which they were sunk, which was eight miles, or more, by water, below Helena, and about seven by land. It was also distant from New Orleans about 700 miles, and about 100 miles from Memphis, and a good deal further from Pittsburg. There were no telegraphs in Arkansas *at that time*, nor does witness think there was one at Memphis then, (1850.) The boats were already nearly entirely sunk, and there was danger of their

sliding off into deep water, and the fall of the river increased the danger. It would have taken about two weeks to have written to New Orleans and received an answer, and about three weeks to have written and received an answer from Pittsburg. Witness thought, situated as the boats were, that $200 would have been a full price for them, and so told Latimer. They had thrown into the river the coal from one of the boats, so that the *Bulk Head* was uncovered, and exposed at one end.

The persons in charge seemed to have done every thing that could be done to save the boats and cargo. From his knowledge of the shore, and depth of water at that point, if the boats had sunk into the deep water, close to the outside of them, they and the coal would have been a total loss.

*Dr. Hubbard* was introduced by the plaintiff, but the principal portion of his evidence, as above copied, was brought out on cross-examination.

Here the plaintiff closed.

*Cooper*, a witness for defendant, states that he went with Dr. Hubbard to examine the boats. He did not go on them. Only 18 inches or two feet of the edges of the boats were visible; the outside of the boats, next the river, being under water. The bank was a slanting one, descending at an angle of about 45 degrees. The boats were about six feet deep, and all under water except about 18 inches of their tops, outside, next the bank, etc.

*George Porter*, (for defendant,) states, he had lived upon the Mississippi river a long time. That the pilots were the commanders of flat boats, on the river, in the absence of the owner or supercargo.

It was never usual to have any one on flat boats, except the pilot, who had any command or control. The pilot was commander, and stood in the place of captain or commander of steamboats.

(3) The plaintiff objected to the testimony of this witness,

on the ground that it did not relate to coal boats, but the court overruled the objection.

*Underwood*, (for defendants,) states that he had been flat-boating on the Mississippi about 20 years. That the pilot of a flat-boat is captain and commander where there is no supercargo. The pilot of a flat and *coal*-boat is commander, and there is usually no other officer on board. The pilot is employed to navigate the boat, and he has usually the full command.

(6.) To which the plaintiff objected, except so far as related to coal-boats, but the court overruled the objection.

(7.) The plaintiff moved the following instructions, which the court refused:

1. " That by the law of the land the pilot of a coal-boat descending the Mississippi river from Pittsburg to New Orleans, in the ordinary course of trade, who has no other interest in the boat or coal, than mere pilot, has no authority to sell the boat or the coal, unless specially authorized by the owner of the boat or coal; and unless there has been some evidence that he was so authorized by the owners, the jury cannot find or presume that he had any such authority; and the fact of such boats being wrecked or stranded, or sunk on the voyage, confers no such authority on the pilot unless specially given.

2. " That if the jury find for the plaintiff, the measure of damages in this case, is the amount paid by Marlatt in and about the judgment recovered against him at Pittsburg.

3. " That if the jury find for the plaintiff, they will assess damages at the amount paid by Marlatt on the judgment recovered against him by Owen & Johnson, including attorney's fees in the case.

4. " That if it has been proved to the satisfaction of the jury that the pilot of the coal-boats in controversy had no authority to sell them under any circumstances, the jury cannot, against such evidence, presume that he had such authority."

(8.) The defendants moved the following instructions, which the court gave:

1. " If the jury believe, from the evidence, that the pilot of

the coal-boats mentioned in the evidence, stood in the place of commander thereof, and said boats were snagged, or wrecked, and more particularly sunk, and were in imminent peril of sinking, or becoming a total loss before instructions could have been asked for and received from the owners, or their agents, having authority to give instructions in such emergency, and such pilot, in good faith, acting for the owners, and exercising the discretion of a fair reasonable man, sold the boats and contents, honestly believing it to be for the best interest of the owners, and the purchasers had no good reason to suspect the contrary, then such sale was valid as against the owners and all the world, and no recovery can be had in this cause for any failure of the title conveyed by such purchaser to said plaintiff.

2. "The judgment against Marlatt in favor of Owen & Johnson, is no evidence whatever against defendants as to the facts or title, unless it has been proved that said defendants were notified of the pendency and objects of the suit, and had an opportunity of defending the same.

3. "Plaintiff cannot recover in this action unless it is proven to the satisfaction of the jury, that said Owen & Johnson had an older and better title than that conveyed by Clary & Latimer to said plaintiff.

4. "Plaintiff cannot recover in this action in the absence of proof of notice to said defendants of the pendency and objects of said suit in Pennsylvania, and an opportunity to defend, unless he shows that he presented and gave in evidence, in that suit, every fact, which would have vindicated and established the title of Clary & Latimer, and which facts he knew, or could reasonably have ascertained by application to Clary & Latimer, or other persons, where the boats were wrecked.

5. "The jury will reject and exclude from consideration any evidence tending to prove any custom in Pittsburg, or elsewhere, in regard to the powers of pilots of coal-boats.

6. "If the jury are satisfied any witness whose testimony is before them, states matters which he does not personally know, they should disregard such statement; and if any witness states

any matter which he does not show he had the means of personally knowing, it is just cause for giving less weight to his testimony, and the jury, if they believe it to be untrue, may disregard it altogether."

1. This suit being for a breach of an implied warranty of title in the sale of the coal-boats, it was necessary for Marlatt to prove, in order to succeed, that the property had been recovered from him by a title paramount to that which he derived from Clary & Latimer. If he had shown that he had given them due and proper notice of the pendency of the suit brought against him by Owen & Johnson, at Pittsburg, for the recovery of the value of the property, the record of the proceedings and judgment in that suit, would have been conclusive evidence that the recovery was upon a title paramount to that derived by him from Clary & Latimer, it appearing that the recovery was not upon a title derived from Marlatt after he purchased the property from Clary & Latimer. *Whitfield vs. Boyd ex.*, 19 *Ark.* 447. But there is no sufficient evidence in the record before us that Clary & Latimer were duly and properly notified of the pendency of the suit brought by Owen & Johnson against Marlatt for the property. *Wm. R. Graham* testified that he heard Marlatt's son tell Clary that Marlatt had been sued for the boats and coal. But this was not sufficient proof of notice. It does not appear when this information was given to Clary, nor that he was told in what Court, or where the suit had been brought.

There being no sufficient proof of notice to Clary & Latimer, of the pendency of the suit against Marlatt, for what purpose, and to what effect had he the right to read as evidence the record of that suit upon the trial of this? There are some adjudications which support the position that he could only read the record to prove the eviction, or that the property had been recovered by an adverse suit, but that he would have to prove by other and additional evidence that the eviction or recovery was upon title paramount to that which he derived from Clary & Latimer. (See 3 *Bibb* 175–280; 3 *Yerger* 403; 16 *Mo.* 168;

4 *Cowen & Hill's notes, p.* 4.)   There are other adjudications which support the position that Marlatt had the right to read the record of the judgment against him as *prima facie* evidence that the recovery was upon title paramount, it appearing that it was not derived from himself, but that it was competent for Clary and Latimer to enquire into the merits of the judgment, and to prove that the recovery was not upon a title better than that derived from them.   These adjudications are based upon the reasoning that on the presumption of *omnia rite acta*, the judgment is, of itself, *prima facie* evidence of the title being paramount, and that it is better to put the burden of proof on the party who is bound to make the title good, and who is supposed to know what title he had when he sold the property and made the warranty.   See *Rawle on Covenants for Title, p.* 252–3–4; *Collingwood vs. Irwin,* 3 *Watts* 310; *Paul vs. Witman,* 3 *Watts & Serg.* 409; *Pitkin vs. Leavitt,* 3 *Vermont* 379; *Train vs. Gold,* 5 *Pick.* 379; 3 *Hammond* 486; 9 *Ala.* 572; 17 *Pick.* 538.   And the decisions in this Court in *Snider vs. Greathouse,* 16 *Ark.* 80, accords, upon principle, with these adjudications.

It follows that the second instruction given by the Court below, to the jury, at the instance of Clary & Latimer, was erroneous, because it asserts that the record of the judgment recovered by Owen & Johnson, against Marlatt, was no evidence whatever against Clary & Latimer, as to title, etc., for the want of notice to them, etc.

The *third* instruction, given at the instance of Clary & Latimer, was also erroneous, if the Court meant to tell the jury that, in addition to the record of the recovery against him, Marlatt was required to prove, by other evidence, that the recovery was upon an older and better title than that derived by him from Clary & Latimer—the record, as we have seen, being *prima facie* evidence of a recovery upon paramount title, and putting the burden of opposing proof upon them.

The *fourth* instruction, given at the instance of Clary & Latimer, was erroneous, because it makes the effect of the record

of the recovery against Marlatt depend upon his diligence in the defence of the adverse suit, and not upon the fact of notice, or no notice to Clary & Latimer of its pendency. If there was notice, the record was conclusive evidence of a recovery upon title paramount; if there was no notice, the record is *prima facie evidence*, subject to be rebutted. This rule is simple, plain and easily followed in practice, and avoids the uncertainty of placing the effect of the record upon the question of diligence in the defence of the adverse suit.

2. In a suit by a purchaser of *personal property* against the seller, upon a warranty of title, the value of the property is the measure of damages. *Sedgwick on Damages, p.* 294. If the property has been recovered of the purchaser, by a third party, upon title paramount, and the purchaser has given the seller due and proper notice of the adverse suit, requiring him to defend, he is also entitled to recover the costs and expenses necessarily incurred in defending the suit; but if he has given the seller no notice of the pendency of the suit, he is not entitled to recover of him such costs and expenses. If the purchaser chooses to take upon himself the burthen of defending the adverse suit without notice to his warrantor, it is but just that he should defend at his own expense. *Boyd vs. Whitfield*, 19 *Ark.* 470; *Eldridge vs. Wadleigh*, 12 *Maine* 372; *Story on Sales, sec.* 454; *Sedgwick on Damages, p.* 293–4, *etc.*

It follows that the Court below properly refused to give the *second* and *third* instructions moved by Marlatt, for two reasons: 1st. The value of the property being the criterion of damages, and there being no proof of notice to Clary & Latimer, of the pendency of the suit of Owen & Johnson against Marlatt, the record of the recovery was only *prima facie* evidence that the judgment was for the real value of the property, and in fixing the amount of damages to be recovered by Marlatt, it was the duty of the jury to consider the rebutting proof introduced by Clary & Latimer, as to the real value of the property. 2nd. Inasmuch as there was no sufficient proof that Marlatt gave notice to Clary & Latimer of the pendency of the adverse suit,

he was not entitled to recover the costs and attorney's fees paid by him.

3d. Passing over what some of the witnesses said about flat-boats generally, it was sufficiently proven that the pilots of coal-boats, in the absence of the owners or supercargoes, exercise the powers and duties of captains or commanders.

The authority of the master of a vessel over the cargo is, under ordinary circumstances, limited to the mere duty of transportation and preservation of it. But he may, under circumstances of great emergency, acquire a superinduced authority to dispose of it, from the very nature and necessity of the case; and his act will then become completely binding and obligatory upon the owners of the cargo, whether they are mere shippers or also owners of the vessel. If the master is driven into a port of necessity, and the cargo is perishable, he may sell it, as he may also sell the vessel, in case of urgent necessity. *Story on Agency, sec.* 118.

The master of a vessel is the general agent of the owner for certain purposes, but such general authority is not sufficiently broad to authorize him to sell her, except in case of wreck or other extreme necessity. *Johnson vs. Wingate,* 29 *Maine* 407.

Such being the general law applicable to this class of agencies, we suppose that any special custom prevailing among coal shippers at Pittsburg, which prohibits the pilot or master of a coal-boat from selling it, or the cargo, under any circumstances, even in case of wreck and extreme danger of total loss, would not be binding on purchasers near Helena, in the absence of any proof that they had notice of such special custom.

The Court did not therefore err in refusing to give the *first* and *third* instructions moved by Marlatt, nor in giving the first asked by Clary & Latimer; nor in excluding such portions of the evidence as referred to the special custom prevailing at Pittsburg in reference to the power of pilots of coal-boats shipped from that point.

No substantial objection is perceived to the sixth instruction given for Clary & Latimer.

For the errors above indicated, the judgment is reversed, and the cause remanded, with instructions to the Court below to grant the appellant a new trial, etc.